J-S17034-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JAMIL R. WILLIAMS | : | |
| | : | |
| Appellant | : | No. 2206 EDA 2025 |

Appeal from the Judgment of Sentence Entered April 28, 2025
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0008331-2023

BEFORE:   PANELLA, P.J.E., STABILE, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY FORD ELLIOTT, P.J.E.:                **FILED JULY 27, 2026**

Jamil R. Williams appeals from the judgment of sentence, entered in the Court of Common Pleas of Philadelphia County, following his convictions of one count each of possession of a firearm by a prohibited person, carrying a firearm without a license, and carrying a firearm on public streets or public property in Philadelphia.[1] Williams contests the denial of his pre-trial motion to suppress the firearm he was charged with unlawfully carrying on the grounds that the police lacked reasonable suspicion or probable cause to remove him from his vehicle, pat him down, and search his person. We affirm.

The trial court set forth the facts in this case as follows:

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 6105(a)(1), 6106(a)(1), and 6108, respectively.

During the evening of November 16, 2023, Officer [Edwin] Rodriguez and his partner were on patrol in uniform traveling in an unmarked patrol car in [. . .] Philadelphia. They were working that day in the "5 squad" of the 14th Police District, which was on assignment to patrol violent, high-crime areas [. . .].

While on patrol, Officer Rodriguez observed a Ford Taurus with heavily tinted windows drive past the patrol car in the area of the 5600 block of Morton Street. Officer Rodriguez activated the patrol car's lights and sirens and attempted to pull over the Taurus due to the car's heavy window tint. The driver of the Taurus, later identified as [Williams, . . .] proceeded through an intersection, and then stuck his head out the window to ask if he was being pulled over. The officers replied that he was being pulled over, and [Williams] finally stopped his car.

At the time, Officer Rodriguez had been a Philadelphia police officer for approximately seven years. During that time, he gained experience investigating mostly firearms and narcotics offenses, including in the specific area of 5600 Morton Street, which [he] knew to be a violent, high-crime area. Officer Rodriguez [. . .] had been involved in at least 40 firearms investigations, approximately half of which arose from car stops.

After [Williams] stopped his car, Officer Rodriguez approached the car's driver's side, and his partner approached the passenger's side. [Williams] was the car's sole recipient. Officer Rodriguez asked [Williams] for the car's paperwork, which [he] provided. However, from the beginning of the stop, [Williams] argued continuously with the officers, including with regard to the legality of the stop.

Within the first minute that Officer Rodriguez interacted with [Williams], Officer Rodriguez noticed a square-shaped bulge in the front of [Williams's] waistband. Based on his experience and the location of the bulge, Officer Rodriguez believed that the bulge was consistent with the shape of the handle of a firearm tucked into the front of a sitting person's waistband. Officer Rodriguez asked if there were any firearms in the vehicle, but [Williams] hesitated before finally replying that there were no firearms. By that point, Officer Rodriguez had safety concerns that [Williams] may have [possessed] a firearm. Officer Rodriguez asked [Williams] to step out of the vehicle. However, [Williams] refused to comply. Instead, for the next [eleven] and [one-]half minutes,

[Williams] argued with the officers about the legality of the officers' command [. . .] to exit the vehicle.

During the argument with the officers, [Williams] claimed to have experience with car stops based on [a prior arrest] related to having a firearm in his vehicle. After running [Williams's] paperwork through the computer in his patrol car, Officer Rodriguez returned to the driver's side of [Williams's] car and reiterated his command for [Williams] to exit the car. [Williams] continued to refuse, demanding that the officers call a police supervisor [. . .].

Eventually, one of the officers called for a [. . .] supervisor. When a supervisor arrived on the scene, the supervisor explained to [Williams] that [he] needed to exit the car, emphasizing that the officers' command to exit the car was lawful [. . .]. At this point, [Williams] finally exited the car, and Officer Rodriguez again asked if [Williams] had any weapons on him. [Williams] did not answer. Officer Rodriguez then frisked [Williams's] waistband area and recovered a firearm from [Williams's] waistband.

Trial Court Opinion, 10/9/25, at 2-4 (internal citations omitted).

On October 18, 2024, Williams filed a pretrial motion to suppress the recovered firearm. He alleged that the police unlawfully "stopped and frisked" him without a warrant, in violation of his rights under the United States and Pennsylvania Constitutions. Pretrial Motion to Suppress, 8/18/24, at 1.

On January 13, 2025, the court held a hearing on the motion to suppress wherein the Commonwealth presented the live testimony of Officer Rodriguez. The court denied Williams's motion to suppress. *See* N.T. Suppression Hearing, 1/13/25, at 42. On the same date, Williams proceeded to a non-jury trial, wherein the parties stipulated to the admission of the non-hearsay testimony from the suppression hearing, along with other exhibits, and the court found Williams guilty of all charges. *See id.* at 43-50. On April 28, 2025,

the court sentenced Williams to 40 to 80 months of incarceration and a concurrent period of seven years' reporting probation. *See* N.T. Sentencing Hearing, 4/28/25, at 26. Following the denial of post-trial motions, Williams filed a timely appeal on August 14, 2025. Both Williams and the trial court have complied with Pennsylvania Rule of Appellate Procedure 1925.

On appeal, Williams argues that the trial court erred in denying his suppression motion. *See* Appellant's Brief, at 7. Specifically, Williams contends that there was no reasonable suspicion or probable cause to remove him from the vehicle or to conduct the subsequent pat-down search. *See id.* We disagree.

First, Williams argues that his removal from the vehicle was unlawful. *See id.* at 9. Williams relies on this court's decision in *Commonwealth v. Jones*, 2022 WL 289261(Pa. Super., filed Feb. 1, 2022) (829 EDA 2024) (unpublished memorandum),[2] for the proposition that removal from a vehicle to conduct a *Terry* stop and frisk[3] should only "occur when there is reasonable

---

[2] *See* Pa.R.A.P. 126(b)(2) (unpublished memorandum of this Court, issued after May 1, 2019, may be cited for persuasive value).

[3] *See Terry v. Ohio*, 392 U.S. 1 (1968). A pat-down search, commonly referred to as a "*Terry* frisk," is "a limited search of the individual's outer clothing in an attempt to discover the presence of weapons which might be used to endanger the safety of the police officer and others[.]" *Commonwealth v. Hicks*, 253 A.2d 276, 279 (Pa. 1969); *see also Commonwealth v. Davis*, 102 A.3d 996, 999 (Pa. Super. 2014) (explaining that *Terry* frisk search is a type of investigative detention with purpose of protecting officers during their investigation).

suspicion or when a driver does not cooperate with police." Appellant's Brief, at 9. Williams argues that Officer Rodriguez did not have the requisite reasonable suspicion to order Williams from the vehicle because his justification was "spurious" and his testimony regarding the area as high crime was "by rote." *Id.* at 11. Specifically, Williams argues that Officer Rodriguez did not explain why a square-shaped bulge near Williams's belt buckle was likely to be a gun. *See id.* at 10. Williams also relies on the fact that Officer Rodriguez did not inform any of his fellow officers about the possibility of a firearm. *See id.* at 10-11.

Williams also argues that the subsequent search of his person was unconstitutional because the officers lacked reasonable suspicion or probable cause. *See id.* at 11. Williams acknowledges that police officers may conduct a pat-down search of an individual only when they can establish reasonable suspicion that the individual may be armed and dangerous. *See id.* at 9. Williams notes that, in the reasonable suspicion inquiry, any unparticularized suspicions or hunches are disregarded. *See id.* Williams argues that Officer Rodriguez's inference that the square-shaped bulge near his belt buckle could be a gun was improper because a gun is not square-shaped. *See id.* at 10. He also argues that Officer Rodriguez's testimony was insufficient to establish that this particular area of Philadelphia is a high-crime one. *See id.*

Our standard of review from the denial of a motion to suppress is well-established:

> [O]ur standard of review [. . .] is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. We are bound by the suppression court's factual findings so long as they are supported by the record; our standard of review on questions of law is *de novo*. Where, as here, the defendant [appeals from] the ruling of the suppression court, we may consider only the evidence of the Commonwealth and so much evidence for the defense as remains uncontradicted. Our scope of review of suppression rulings includes only the suppression hearing record and excludes evidence elicited at trial.

***Commonwealth v. Singleton***, 169 A.3d 79, 82 (Pa. Super. 2017) (citations omitted). Moreover, with respect to the suppression court's factual findings, it is the sole province of the suppression court to weigh the credibility of witnesses. ***See Commonwealth v. Heidelberg***, 267 A.3d 492, 499 (Pa. Super. 2021) (*en banc*). Further, the suppression court judge is entitled to believe all, part, or none of the evidence presented. ***See Commonwealth v. Caple***, 121 A.3d 511, 517 (Pa. Super. 2015).

Both the Fourth Amendment to the United States Constitution[4] and Article I, Section 8 of the Pennsylvania Constitution[5] protect the right of the

_____

[4] The Fourth Amendment states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. Amend. IV.

[5] Article I, Section 8 states:
*(Footnote Continued Next Page)*

people against unreasonable searches and seizures in their persons, houses, papers, and possessions. *See Commonwealth v. Barnes*, 296 A.3d 52, 56 (Pa. Super. 2023). Specifically, courts in Pennsylvania require law enforcement officers to establish increasing levels of suspicion to justify their interactions with citizens. *See Commonwealth v. Luczki*, 212 A.3d 530, 542 (Pa. Super. 2019). Police interactions with citizens are classified into three categories: mere encounters, investigative detentions, and custodial detentions. *See id.* Generally, courts consider a motor vehicle stop to be an investigative detention, triggering the constitutional protections outlined above. *See Commonwealth v. Clinton*, 905 A.2d 1026, 1030 (Pa. Super. 2006). An investigative detention requires reasonable suspicion because of its compulsory nature. *See Commonwealth v. Jones*, 874 A.2d 108, 116 (Pa. Super. 2005). "A *Terry* frisk is a type of investigative detention requiring reasonable suspicion that 'criminal activity is afoot and that the individual

_____

> The people shall be secure in their persons, houses, papers, and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

PA. CONST. Art. I, § 8. While this language "echoes" that of the Fourth Amendment of the United States Constitution, our Supreme Court has held that the Pennsylvania Constitution provides a higher level of protection than the Fourth Amendment as interpreted by the United States Supreme Court. *Commonwealth v. Enimpah*, 62 A.3d 1028, 1030 n.4 (Pa. Super. 2013).

whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others.'" ***Commonwealth v. Davis***, 102 A.3d 996, 999 (Pa. Super. 2014) (citations and some quotation marks omitted).

Here, Williams has not challenged the legality of the stop itself, but instead argues that there was no reasonable suspicion or probable cause to remove him from the vehicle. ***See*** Appellant's Brief, at 7. The Supreme Court of the United States has long recognized the inordinate risk facing officers as they approach individuals sitting in automobiles. ***See Pennsylvania v. Mimms***, 434 U.S. 106, 110 (1977) (*per curiam*); ***see also United States v. Robinson***, 414 U.S. 218, 234, n.5 (1973) ("[A] significant percentage of murders of police officers occurs when the officers are making traffic stops."). As such, police officers are not required to take unnecessary risks while performing their duties. ***See Terry v. Ohio***, 392 U.S. 1, 23 (1968). Thus, the permissible scope of a traffic stop generally includes attending to any related safety concerns, in addition to the ordinary inquiries related to the traffic violation that warranted the stop. ***See Rodriguez v. United States***, 575 U.S. 348, 355-56 (2015); ***see also Commonwealth v. Toliver***, 355 A.3d 920, 936 (Pa. Super. 2026) ("police officers, during the course of a traffic stop, are permitted to take action to both 'address the traffic violation' as well as to 'attend to related safety concerns'") (citation omitted).

Police officers are permitted to take certain actions in responding to safety concerns, including controlling the movement of the vehicle's

occupants. *See Commonwealth v. Pratt*, 930 A.2d 561, 567-68 (Pa. Super. 2007) ("[A]llowing police officers to control all movement in a traffic encounter [. . .] is a reasonable and justifiable step towards protecting their safety."). To that end, during a lawful traffic stop, police officers may order the driver of the vehicle to exit the vehicle, even absent a reasonable suspicion of criminal activity. *See Commonwealth v. Ross*, 297 A.3d 787, 791 (Pa. Super. 2023). Further, police may request to review the vehicle registration, the driver's license, and any other information required to enforce the motor vehicle code and may ask questions about the presence of weapons. *See Commonwealth v. Mack*, 953 A.2d 587, 589 (Pa. Super. 2008); *Clinton*, 905 A.2d at 1031-33.

After our review, we conclude that Williams's removal from his vehicle was constitutional because it occurred during a lawful motor vehicle stop. Officer Rodriguez lawfully pulled over Williams for illegally tinted windows and Williams does not contest the legality of the stop. *See* N.T. Suppression Hearing, 1/13/25, at 8; Trial Court Opinion, 10/9/25, at 5. Even if Officer Rodriguez did not possess reasonable suspicion that Williams was armed and dangerous, he was still permitted to remove Williams from the vehicle pursuant to a lawful traffic stop. *See Ross*, 297 A.3d at 791; *Pratt*, 930 A.2d at 567-68.

Williams next argues that, after he exited the vehicle, the subsequent pat-down search of his person was unconstitutional. *See* Appellant's Brief, at 7. To conduct a valid pat down, a police officer must reasonably believe that

his or others' safety is in danger. *See Commonwealth v. Simmons*, 17 A.3d 399, 403 (Pa. Super. 2011). Two conditions must be met for such a search to be constitutionally sound: (1) the investigatory stop must be lawful; and (2) the officer must reasonably suspect the individual is armed and dangerous. *See Interest of T.W.*, 261 A.3d 409, 417 (Pa. 2021); *see also Commonwealth v. Jackson*, 698 A.2d 571, 573 (Pa. 1997) ("Pennsylvania has always followed *Terry* in stop and frisk cases."). "To validate a *Terry* frisk, the police officer must be able to articulate specific facts from which he reasonably inferred that the individual was armed and dangerous." *Commonwealth v. Gray*, 896 A.2d 601, 606 (Pa. Super. 2006) (citation omitted).

In determining whether the officer presented a sufficient articulable basis to justify the frisk search, we examine the totality of the circumstances, taking into account the officer's experience. *See Commonwealth v. Cunningham*, 287 A.3d 1, 10-11 (Pa. Super. 2022) (citation omitted); *see also Simmons*, 17 A.3d at 403 (explaining that totality of circumstances test applies equally to roadside encounters as it does ordinary police encounters). The totality of the circumstances inquiry does not limit our examination to only those facts that clearly indicate criminal conduct. *See Commonwealth v. Young*, 904 A.2d 947, 957 (Pa. Super. 2006)). "An overt threat by the suspect or clear showing of a weapon is not required for a [*Terry*] frisk." *Mack*, 953 A.2d at 591.

Indeed, a police officer need not be absolutely certain that an individual is armed; the question is whether a reasonably prudent man would be warranted in believing that his or others' safety was in danger. *See id.* (quoting *Terry*, 392 U.S. at 27). Even a combination of innocent facts may warrant further investigation by the officer. *See Commonwealth v. Singletary*, 267 A.3d 1267, 1276 (Pa. Super. 2021) (quoting *Commonwealth v. Fulton*, 921 A.2d 1239, 1243 (Pa. Super. 2007)).

Instantly, the trial court addressed the issue as follows:

> Officer Rodriguez noticed a square-shaped bulge in the front of [Williams's] waistband within the first minute that Officer Rodriguez interacted with [Williams]. Based on his experience and the location of the bulge, Officer Rodriguez believed the bulge to be consistent with the shape of the handle of a firearm. [Williams] hesitated in response to Officer Rodriguez's initial question about whether there were any firearms in the vehicle. At the time, based on his personal experience and assignment, Officer Rodriguez knew the specific area of the stop to be a high-crime area, including with respect to firearms and shootings. Moreover, [Williams's] evasive and argumentative behavior throughout the stop, including his refusal to comply with the officers' requests to exit the car for over 10 minutes, heightened the officers' safety concerns. Unprompted, [Williams] also informed the officers of his prior arrest related to having a firearm in a vehicle during a traffic stop. When [Williams] finally exited the car, Officer Rodriguez again asked if [Williams] had any weapons on him, and [Williams] did not answer. At that point, under the totality of the above-described circumstances, Officer Rodriguez had ample reason to be concerned about the safety of the officers based on a reasonable suspicion that defendant was armed and dangerous.

Trial Court Opinion, 10/9/25, at 7-8 (citations omitted).

Upon review, we conclude that the trial court correctly denied Williams's motion to suppress the recovered firearm because his removal from the

- 11 -

vehicle and the subsequent pat-down search of his person were lawful. Officer Rodriguez pulled over Williams's vehicle for having illegal window tints. ***See*** N.T. Suppression Hearing, 1/13/25, at 8. Officer Rodriguez was permitted to order Williams out of the vehicle as a necessary precaution during a traffic stop. ***See Ross***, 297 A.3d at 791. Officer Rodriguez reasonably suspected Williams might be armed and dangerous because, based on his experience, the bulge near Williams's waistband was similar to bulges created by firearms Officer Rodriguez recovered in the past and Williams hesitated when answering a question about the presence of a firearm in vehicle, before replying that there were no firearms in the vehicle, and then did not answer a subsequent question about whether he had any weapons on him. ***See*** N.T. Suppression Hearing, 1/13/25, at 12-13. As such, the police pat-down search of Williams's person was lawful. ***See Cunningham***, 287 A.3d at 10-11; ***Mack***, 953 A.2d at 591; ***Gray***, 896 A.2d at 606.

Williams argues that "Officer Rodriguez did not logically explain why a square shape near Appellant's belt buckle area was likely a gun, which is not square-shaped." Appellant's Brief, at 10. We disagree because Officer Rodriguez's testimony was sufficient to explain why the bulge was likely a gun based on his experience as an officer in the area.[6] At the time, Officer

_____

[6] In describing the bulge, Officer Rodriguez explained that the spot on Williams's person where he noticed the bulge was usually "a good spot where [people] will carry a firearm." N.T. Suppression Hearing, 1/13/25, 13. He further explained why the shape of the bulge caught his attention:
*(Footnote Continued Next Page)*

Rodriguez had personally been involved in over 40 firearm investigations, approximately half of which resulted from traffic stops. *See* N.T. Suppression Hearing, 1/13/25, at 10-11. Officer Rodriguez's experience, taken with Williams's argumentativeness, his hesitation to answer the officer's question about the presence of a firearm, before denying the presence of a firearm in the vehicle, which contained his person, and his subsequent failure to reply to a question regarding the presence of a firearm on his person, and the position of the bulge in Williams's waistband, provides sufficient basis to establish reasonable suspicion that Williams could be armed and dangerous.

After examining the totality of the circumstances, we conclude that Officer Rodriguez was permitted to remove Williams from his vehicle during the uncontested traffic stop and had sufficient reasonable suspicion to frisk search him for a weapon. Accordingly, we affirm Williams's judgment of sentence.

Judgment of sentence affirmed.

_____

Just that the handle formation, it's like a square. If he was standing, it would be more like an L shape. It's hard to tell because like I said when you're sitting, if you do have a firearm or cell phone or a belt buckle, you would have some kind of bulge in the front side. Similar to like the top of an L shape or a square.

*Id.* at 13.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/27/2026